2002 OK CIV APP 7

**CUNNINGHAM LINDSEY CLAIMS MANAGEMENT, INC., Plaintiff/Appellant, Cross–Appellee,**

v.

**OKLAHOMA STATE INSURANCE FUND, a department of the State of Oklahoma, Defendant/Appellee, Cross–Appellant.**

No. 95,435.

Court of Civil Appeals of Oklahoma, Division No. 3.

Decided Aug. 28, 2001.

Rehearing Denied Oct. 18, 2001.

Joseph Walters, Oklahoma City, OK, For Plaintiff/Appellant, Cross–Appellee.

Stephen G. Solomon, Gladys E. Cherry, Oklahoma City, OK, For Defendant/Appellee, Cross–Appellant.

## OPINION

GARRETT, Judge.

¶ 1 Appellant, Cunningham Lindsey Claims Management, Inc., (Cunningham),[1] had a contract with Appellee, Oklahoma State Insurance Fund (Fund), to serve as a third party administrator for workers' compensation "lost time" claims on a "per claim" basis. These claims were designated as "Tier II claims". Cunningham alleged the contract price per claim was $730.00, as agreed by the parties and approved by the State Purchasing Director (SPD) of the Department of Central Services (DCS), pursuant to the Oklahoma Central Purchasing Act, (OCPA), 74 O.S.1991 §§ 85.1, et seq., as amended. Cunningham sued Fund for the unpaid portion of $730.00 per claim which it alleged was due on each of 3792 files. Cunningham also sued for $178,120.00, for payment for its work on the claims relating to the Murrah Building bombing, and for reimbursement of $18,261.82 expense for legal experts and $3,600.00 expense for medical experts who assisted it in processing the claims. Cunningham claimed it is due a total of $1,253,366.80. Fund alleged in its answer that the contract price was modified from $730.00 per claim to $475.00 per claim. It also alleged that it never gave Cunningham its approval to process the bombing claims or to incur expenses for the experts.

¶ 2 Cunningham filed a motion for summary judgment. The trial court's order provides as follows:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the contract between the parties was modified from a price of $730.00 for each Tier II "lost time claim" file under the contract to a price of $475.00 per file, and that there-

fore, Plaintiff is not entitled to the balance of $1,053,385.00 for work on the Tier II files. The Court FINDS that Defendant is entitled to summary judgment on that issue.

THE COURT FURTHER FINDS that the Plaintiff is entitled to the modified contract rate of $425.00 per file for reviewing 244 workers compensation files involving individuals who were killed or injured in the bombing of the Murrah Building in Oklahoma City on April 19, 1995. Summary judgment is therefore awarded on this claim in favor of Plaintiff in the amount of $103,700.

THE COURT FURTHER FINDS that Plaintiff is entitled to summary judgment for fees incurred for legal and medical professionals who reviewed the 244 Murrah Building bombing files in the amount of $18,261.82 for the work of Attorney Charles S. Frigerio, and $3,600.00 for the work of Dr. Rick Mustain, D.C.

¶ 3 Cunningham filed this appeal pursuant to Rule 1.36, Supreme Court Rules, 12 O.S. 1991 Ch. 15, App. 1, Accelerated Procedure for Summary Judgments and Certain Dismissals. Fund filed a cross petition in error, alleging error as to the trial court's approval of the payment for the bombing files and for payment of the legal and medical fees incurred as expenses on the bombing files.

■ ¶ 4 In its response to Cunningham's motion for summary judgment, Fund claimed the price for each "Tier II" claim had been modified to $425.00 for non-litigated claims and $475.00 for litigated claims, and that this change had been by agreement with Cunningham. Fund contended its Commissioner at the time, Terry Tyree, had statutory authority to modify the contract without approval of the SPD because his actions related to the administration of the "insurance business", similar to actions which might be taken by the governing body of a private insurance carrier. See 85 O.S.1991 §§ 132, 133.[2]

---

1. Lindsey Morden Claims Management, Inc., (Lindsey Morden), Cunningham's predecessor in interest, is the party who negotiated the contract with Fund.

2. **§ 132. Powers and jurisdiction of State Insurance Fund Commissioner Fixing of rates by Board of Managers**

    The State Insurance Fund Commissioner is hereby vested with full power, authority and

Fund contends these statutes carve out an exception to the OCPA for its Commissioner. See also 85 O.S. Supp.1996 § 134,[3] which defines the powers and authority of Fund's Commissioner in conducting Fund's business and affairs.

¶ 5 Fund contends the contract was modified by a letter dated April 9, 1996, from Paul R. Maggi, of Lindsey Morden, now, Cunningham, to John Yoder of "Alexander & Alexander", as follows:

Dear John:

Below is Lindsey Morden's quote for adjusting the Strike Force claims effective April 22, 1996.

$425.00    Non–Litigated Files
$475.00    Litigated Files

John, again thank you for your support on this project. If I can be of service, please do not hesitate to call me.

¶ 6 Cunningham contended the contract could not be modified as between the parties to the contract after it was approved by the SPD, following the competitive bidding process. It also contends that the contract was unambiguous on its face and that the court should not have considered extraneous writings which varied its terms.

¶ 7 Fund relies on a paragraph from *Indiana National Bank v. State Department of Human Services,* 1993 OK 101, ¶ 18, 857 P.2d 53, 62–63, wherein the Supreme Court stated as follows:

[W]e now squarely hold it is only OPA[4] that has authority to approve material modifications of agreements once it has accepted a bid in response to an invitation to bid, *in the absence of some other Legislative authority to the contrary or specific approval from OPA sanctioning another agencies' authority* to agree to such a modification. To rule otherwise would completely obliterate the Central Purchasing Act. [Emphasis supplied.]

---

jurisdiction over the State Insurance Fund. He shall perform any duties which are necessary or convenient in the exercise of any power, authority, or jurisdiction over the fund in the administration thereof, or in connection with the insurance business to be carried on by him under the provisions of Sections 131 and 151 of this title as fully and completely as a governing body of a private insurance carrier might or could do including the acquisition, operation and maintenance of an electronic data processing facility.

The Board of Managers of the State Insurance Fund shall have full power and authority to fix and determine the rates to be charged by the State Insurance Fund for insurance.

3.    134. Power and authority of Commissioner or delegated officer in conducting business and affairs of Fund

A. In conducting the business and affairs of the State Insurance Fund, the Commissioner of the said fund, or other officer to whom such power and authority may be delegated by the Commissioner, as provided by Section 133 of this title, shall have full power and authority:

1. To enter into contracts of insurance, insuring employers against liability for compensation, and insuring to employees and other persons entitled thereto compensation as provided by the Workers' Compensation Act, Section 1 et seq. of this title;

2. To decline to insure any risk in which the minimum requirements of the law with regard to construction, equipment and operation are not observed, or which is beyond the safe carrying of the State Insurance Fund, but shall not have power or authority, except as otherwise provided in this act to refuse to insure any compensation risk tendered with the premium therefor;

3. To enter into contracts of insurance insuring persons, firms and corporations against loss, expense or liability by reason of bodily injury, death by accident, occupational disability, or occupational disease suffered by employees for which the insured may be liable or have assumed liability;

4. To purchase reinsurance for any risk or any portion of any risk of the State Insurance Fund;

5. To inspect and audit, or cause to be inspected and audited the pay rolls of employers applying for insurance against liability for compensation;

6. To contract with physicians, surgeons and hospitals for medical and surgical treatment and the care and nursing of injured persons entitled to benefits from said fund;

7. To meet the reasonable expenses of conducting the business of the State Insurance Fund;

8. To produce a reasonable surplus to cover catastrophe hazard; and

9. To administer a program in compliance with Section 924.3 of Title 36 of the Oklahoma Statutes, whereby employers may appeal rating classification decisions which are disputed. The State Insurance Fund shall notify employers of the availability of the program. ....
[Footnotes omitted.]

4.    The Oklahoma Board of Public Affairs is now the Department of Central Services.

¶ 8 Fund contends the highlighted portion of the quotation from *Indiana National Bank v. State Department of Human Services*, supra, indicates the Court's recognition that statutory authority could exist to which the OCPA must defer, although none applied to exempt DHS therein. Fund argues 85 O.S.1991 §§ 132, 133, supra, which are specific statutes, show Legislative intent to exempt it from the requirements of the OCPA, which is general in nature. However, we interpret §§ 132–134 to be merely Legislative intent to designate Fund's Commissioner as the party who negotiates on Fund's behalf.[5]

¶ 9 We do not agree that Fund's Commissioner has authority to modify contracts without the OCPA director's approval. We have not been cited to a statute which specifically exempts the Fund from the requirements of the OCPA, or which provides the Fund is authorized to *modify contracts* between the SPD and private vendors following the OCPA bidding process. The OCPA exempts some agencies from its purview, but the Fund is not included.[6]

¶ 10 The Supreme Court states in *Indiana National Bank v. State Department of Human Services*, at 857 P.2d 53, 61–63:[7]

INB points to no statute or rule that would be relevant to the instant situation which expresses an intent to allow agencies the ability to modify contractual terms submitted with a bid *after OPA has awarded a contract,* and, like the Court of Appeals,

we believe to allow any material modifications by agencies after a contract is awarded by OPA, without approval of OPA, would completely undermine the intent and purpose behind the Act.

The language of the Act and the rules clearly indicate it is OPA that is to be the sole entity with the authority to negotiate and accept contract offers, with certain exceptions not relevant here. To allow agencies to subsequently negotiate and modify material clauses after other parties have been excluded through the competitive bidding process undermines the integrity of the system and makes such a system meaningless.... [Emphasis supplied.] [Footnotes omitted.]

¶ 11 Fund also argued the contract modification was ratified by the Director of Central Purchasing because the Director is a member of the Board of Managers for the Fund and knew of the change. However, the record does not contain an affidavit, or other evidentiary material, from the Director. Moreover, the trial court's order contains no finding on this issue, and we offer no opinion thereon.

■ ¶ 12 A motion for summary judgment should be denied if facts concerning any issue conflict, or if reasonable men, in the exercise of fair and impartial judgment, might reach different conclusions from undisputed facts. See *Perry v. Green,* 1970 OK 70, 468 P.2d

5.  74 O.S. Supp.1997 § 85.7 (C) (since amended), provides:
    C. Bids for professional service contracts shall be evaluated by the State Purchasing Director and the agency contracting for such service. Both cost and technical expertise shall be considered in determining the lowest and best bid. Further, such agency shall present its evaluation and recommendation to the State Purchasing Director. A documented evaluation report containing the evaluations of the State Purchasing Director and the agency contracting for such service shall be completed prior to the awarding of a professional service contract and such report shall be a matter of public record.

6.  74 O.S. Supp.1994 § 85.12 (since amended), in effect at the time this contract arose, specified certain agencies which were excluded from the requirements of the OCPA. The Fund was not specified.

See also **74 O.S. Supp.1999 § 85.3a**, although it was added after the parties entered into the contract. It provides:
Compliance with the provisions of the Oklahoma Central Purchasing Act shall not be required of:
1.  County government;
2.  The Oklahoma State Regents for Higher Education, the institutions, centers, or other constituent agencies of the Oklahoma State System of Higher Education; or
3.  The telecommunications network known as OneNet.

7.  Attorney General Opinions, 1988 OK AG 61 and 2001 OK AG 2, cited by Cunnigham, appear to be in accord with *Indiana National Bank v. State Department of Human Services,* supra. However, Attorney General Opinions are advisory and may not be cited as a legal precedent.

483, 488–489; *Thompson v. Box,* 1994 OK CIV APP 183, 889 P.2d 1282.

 ¶ 13 Even if we had found the Fund's Director had authority to modify this contract on his own, this effort to modify the contract fell short as a matter of law. The modification of a contract must be done pursuant to the statutory requirements of 15 O.S.1991 § 237, which provides:

A contract in writing may be altered by a *contract* in writing, or by an executed oral agreement, and not otherwise. [Emphasis supplied.]

Under 15 O.S.1991 § 2, the essential elements of a *contract* are:

1. Parties capable of contracting.
2. Their consent.
3. A lawful object; and,
4. Sufficient cause or consideration.

The April 9, 1996 letter does not specifically mention the Tier II "lost time claim" files or the Fund. It is not a letter between the two contracting parties. It refers to the "Strike Force" files, but does not explain what they are or how they relate to the claims at issue herein. It does not state the consideration given for the alleged reduction in contract price. As a matter of law, the April 9, 1996 letter does not constitute a modification of the contract. It is clear, however, there is a factual dispute as to whether the parties intended to modify the price per claim. There was evidence that Cunningham billed Fund $475.00 per claim and was paid that amount. However, Cunningham explains that the contract called for an initial billing and a reconciliation of the billing on the anniversary date of the contract. Fund contends Cunningham only balked at the lower figure when it realized it would not be given the contract in the future. With these factual issues, summary judgment was improper.

■ ¶ 14 Fund contends it did not authorize Cunningham to do the work on the claims arising from the Murrah Building bombing. Evidence was presented that Tyree only asked Cunningham to work up a proposal which Fund would then consider. Fund claims Cunningham never presented a proposal, and instead, proceeded to do the claims adjustment work on the bombing files.

However, the parties presented different explanations for the fact Cunningham had the files in its possession. Cunningham contends they had an agreement to do the work. Fund contends the files were given to Cunningham to work up a proposal to present to Fund. The material facts are, therefore, disputed, and summary judgment in Cunningham's favor was improperly granted.

¶ 15 The trial court's order is reversed, and this case is remanded to the trial court for further proceedings.

¶ 16 REVERSED AND REMANDED.

HANSEN, C.J., and JONES, J., concur.